UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID JOSHUA BARTCH,<br><br>Plaintiff,<br><br>-v-<br><br>DIGITAL BRANDS GROUP, INC.,<br><br>Defendant. | 26-CV-8734 (JMF)<br><br>OPINION AND ORDER |

JESSE M. FURMAN, United States District Judge:

Plaintiff and Counter-Defendant David Josh Bartch, an investor, sues Defendant and Counter-Claimant Digital Brands Group, Inc. ("DBGI"), an apparel and e-commerce company, for breach of contract. *See* ECF No. 1 ("Compl."), ¶¶ 119-133. DBGI, in turn, brings counterclaims against Bartch for breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent inducement, and violations of the Securities Exchange Act of 1934 (the "Exchange Act"). *See* ECF No. 26 ("Answer"), ¶¶ 81-120, at 67-76.[1] Now pending is Bartch's motion, pursuant to Rule 65 of the Federal Rules of Civil Procedure, for a preliminary injunction requiring DBGI to comply with its contractual agreements. *See* ECF No. 5 ("Proposed Order to Show Cause"); ECF No. 6 ("Pl.'s Mem."). For the reasons that follow, Bartch's motion is GRANTED.

---

[1] In its Answer, DBGI duplicates paragraph numbers when referring to its Counterclaims. *See* ECF No. 26. To avoid confusion, the Court identifies both paragraph numbers and page numbers when citing to DBGI's Answer.

## BACKGROUND

Bartch's claims are brought pursuant to two securities purchase agreements. The first agreement, the "Warrant SPA," involves warrants — securities that come with the right to buy stock at a certain price for a period of time. *See, e.g.*, *Xeriant, Inc. v. Auctus Fund LLC*, 141 F.4th 405, 409 n.2 (2d Cir. 2025); Richard A. Booth, Financing the Corporation, *Rights and Warrants* § 3:8 (2026 ed.). In February 2025, Bartch agreed to pay $1,700,000 to DBGI in exchange for 41,845 shares of common stock, 2,534,297 pre-funded warrants, and the right to exercise — that is, convert to pre-funded — over 5,152,283 million common warrants. *See* ECF No. 7-1 ("Warrant SPA"); Compl. ¶¶ 27-28; Pl.'s Mem. 1. Pursuant to the agreement, DBGI was required to issue pre-funded warrants "exercisable immediately," Warrant SPA § 1.1, and "to reserve and keep available at all times, . . . a sufficient number of shares of Common Stock for the purpose of enabling [DBGI] to issue Shares pursuant to this Agreement, Pre-Funded Warrant Shares pursuant to any exercise of the Pre-Funded Warrants, and Warrant Shares pursuant to any exercise of the Common Warrants," *id.* § 4.8. For his part, Bartch represented, among other things, that he was "acquiring the Securities hereunder in the ordinary course of its business" and had "no direct or indirect arrangement or understandings with any other persons to distribute or regarding the distribution of such Securities." *Id.* § 3.2(b).

The second agreement, the "Series D SPA," concerns Series D Convertible Preferred Stock, a special class of DBGI stocks issued in an August 2025 private offering. *See* Compl. ¶¶ 33-36; ECF No. 7-3, at 1-38 ("Series D SPA"); *id.* at 47-55 ("Sept. 2025 Series D Amendments"); ECF No. 7-4 ("Certificate of Designation") (together with the Series D SPA and

the Sept. 2025 Series D Amendments, the "Series D Transaction Documents").[2] On December 15, 2025, in exchange for a payment of $1,150 per share, Bartch acquired from seven holders 7,999 shares of Series D Convertible Preferred Stock, as well as the rights and obligations set forth in the Series D Transaction Documents. *See* Compl. ¶¶ 38, 41, 47-48; ECF No. 7-2 ("Dec. 2025 Series D SPA"), at 2, 15-18; *see also* Series D SPA § 5.7 (setting forth assignment procedures); Certificate of Designation § 16 (same). Pursuant to these documents, DBGI agreed

> not [to] refuse to deliver unlegended shares based on any claim that such Purchaser or anyone associated or affiliated with such Purchaser has not complied with Purchaser's obligations under the Transaction Documents, or for any other reason, unless, an injunction or temporary restraining order from a court, on notice, restraining and or enjoining delivery of such unlegended shares shall have been sought and obtained by [DBGI] and [DBGI] has posted a surety bond for the benefit of such Purchaser[.]

Series D SPA § 4.1(e).

Beginning earlier this year, DBGI refused to honor these agreements. It started with the warrants. On April 29, 2026, Bartch notified DBGI and its Transfer Agent, ClearTrust, that he sought to exercise 760,000 pre-funded warrants. *See* ECF No. 7-5, at 4; Compl. ¶ 49; ECF No. 7 ("Bartch Decl."), ¶ 13. The same day, DBGI's Chief Executive Officer, John Hilburn Davis, denied the request on the ground that there were "no more PFW [pre-funded warrants] available period." ECF No. 7-6, at 5; Pl.'s Mem. 7; Compl. ¶ 52. Over the next few weeks, Davis rejected Bartch's requests several more times, repeatedly offering new reasons. For instance, on May 5, 2026, Davis cited "issues . . . created by [Bartch] himself," including "not providing all the

[2] Pursuant to Section 151(g) of the Delaware General Corporation Law, a company can "issue shares of preferred stock in a class or in a series of a class" through a "certificate of designation[]," which "amends and becomes part of the certificate of incorporation." *In re Fox Corp./Snap Inc.*, 312 A.3d 636, 649 (Del. 2024), *as revised* (Jan. 25, 2024). DBGI's Certificate of Designation created 15,000 shares of preferred stock designated as Series D Convertible Preferred Stock. *See* Compl. ¶ 35.

paperwork" or "requesting shares from incorrect buckets, which depleted certain buckets." ECF No. 7-6, at 2; Bartch Decl. ¶ 15; Compl. ¶¶ 57-58. On May 20, 2026, when Bartch insisted that he "gave [ClearTrust] everything needed from [him]" and inquired "what else is needed," Davis claimed Bartch "agreed to a leak out" — which Bartch disavows. ECF No. 7-8, at 1-3; Bartch Decl. ¶ 19.[3] Davis further suggested he would "take all this to" the Securities and Exchange Commission ("SEC"). ECF No. 7-8, at 2. On May 21, 2026, Davis informed Bartch that DBGI had "heard some disturbing news regarding collusion and illegal shorting" and would not honor his request to exercise the warrants "until [DBGI] learn[ed] more." ECF No. 7-9, at 1; Compl. ¶ 69; Bartch Decl. ¶ 20. And on May 22, 2026, Davis accused Bartch of "instruct[ing] others to short the stock" and engaging in "collusion and fraud." ECF No. 7-10, at 11. He declared that "there will be no issuances until all these items are flushed out and finalized." *Id.*

Eventually, DBGI effectively made its refusals to honor Bartch's requests public. On June 15, 2026, DBGI issued a press release cancelling 7.1 million pre-funded warrants and announcing that "[s]hareholders are requesting a formal investigation into suspected misconduct, market manipulation, and the undisclosed use of foreign silent partners as nominees." ECF No. 7-11, at 3; Bartch Decl. ¶ 22; Compl. ¶ 99. To date, Bartch's requests pursuant to the Warrant SPA remain unfulfilled. *See* Bartch Decl. ¶¶ 17, 23.

In August 2026, a similar dispute arose with respect to the Series D Transaction Documents. On August 16, 2026, Bartch sought to convert $400,000 of his Series D Preferred Stock into common stock, pursuant to the Series D Transaction Documents. *See* Bartch Decl. ¶ 26; ECF No. 7-15, at 21-22. In response to Bartch's request, ClearTrust reported that it did not

---

[3] A leak-out agreement typically limits the quantity of shares that can be sold within a given period of time. *See Augenbaum v. Anson Invs. Master Fund LP*, No. 22-CV-249 (VM), 2023 WL 2711087, at *10 (S.D.N.Y. Mar. 30, 2023).

have records reflecting the transfer of Series D Preferred Stock from the original holders to Bartch. ECF No. 7-15, at 15-22. When Bartch asked Davis to process the conversion, Davis responded that Bartch was not "in the Series D legal docs." *Id.* at 17; Bartch Decl. ¶ 27; Compl. ¶ 84. Over the next few days, Bartch supplied additional documentation, and on August 20, 2026, ClearTrust confirmed the transfer form "appear[ed] to be completed correctly" but noted Bartch needed to "confirm whether there are sufficient shares registered in the name of [the original holder]." ECF No. 7-19, at 5; Compl. ¶ 89. The original holder confirmed the sale and assignment of the shares to Bartch, including by fulfilling DBGI's request to send "copies of all assignment/transfer documents." ECF No. 7-16, at 2-3; Compl. ¶ 91. Nevertheless, to date, DBGI has not honored Bartch's conversion request pursuant to the Series D Transaction Documents. *See* Compl. ¶ 92; Bartch Decl. ¶¶ 27-28.

On October 2, 2026, just weeks after a similar lawsuit was filed against DBGI by a pair of other investors in Series D Preferred Stock, *see Gaucher v. Digital Brands Group, Inc.*, Dkt. No. 26-CV-6889 (JMF) (filed Aug. 14, 2026), Bartch filed this case. *See* ECF No. 1. In his Complaint, he asserts two counts of breach of contract, the first relating to the Warrant SPA and the second relating to the Series D Transaction Documents. *See* Compl. ¶¶ 119-33. On October 5, 2026, approximately one month after the *Gaucher* plaintiffs had done the same, Bartch filed a motion for a preliminary injunction to compel DBGI to fulfill its contractual obligations. *See* ECF Nos. 5-6. On October 13, 2025, the parties in both actions appeared before the Court for a conference, at which the Court orally granted the *Gaucher* plaintiffs' motion for a preliminary injunction, *see* Dkt. No. 26-CV-6889, ECF Nos. 70-71, and set a discovery schedule for both cases, *see* ECF No. 18. A few weeks later, DBGI filed its Answer, asserting counterclaims against Bartch for breach of contract, breach of the implied covenant of good faith and fair

dealing, fraudulent inducement, and violations of the Exchange Act. *See* Answer, ¶¶ 81-115, at 67-76. And on November 8, 2026, DBGI filed its own motion for a temporary restraining order and preliminary injunction seeking an order enjoining all DBGI shareholders from acquiring or disposing of DBGI securities. *See* ECF No. 30-1; ECF No. 31, at 2. On November 10, 2026, the Court orally denied DBGI's request for a temporary restraining order and reserved judgment on its request for a preliminary injunction. *See* ECF No. 39.

## DISCUSSION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain relief, the party seeking a preliminary injunction must show "that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34 (2d Cir. 2010) (internal quotation marks omitted). "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks omitted). Thus, if a party fails to show irreparable harm, a court need not even address the remaining elements. *See, e.g.*, *Roberts v. Atl. Recording Corp.*, 892 F. Supp. 83, 88 (S.D.N.Y. 1995). By the same token, if the moving party fails to demonstrate a likelihood of success on the merits or sufficiently serious questions and a balance of hardships tipping "decidedly" in its favor, the Court may deny relief without addressing the question of harm. *See, e.g.*, *Daily Harvest, Inc. v. Imperial Frozen Foods Op Co. LLC*, No. 18-CV-5838 (ALC), 2018 WL 3642633, at *7-8 (S.D.N.Y. Aug. 1, 2018) (cleaned up).

The Court will address each preliminary injunction factor in turn, beginning with likelihood of success on the merits, the factor that DBGI spills the most ink addressing.

**A. Likelihood of Success on the Merits**

At the outset, DBGI argues that Bartch must satisfy a heightened standard in demonstrating a likelihood of success on the merits. Specifically, DBGI insists that Bartch show "a clear or substantial likelihood of success" because he seeks mandatory relief disruptive of the status quo. ECF No. 23 ("Def.'s Opp'n"), at 17 (quoting *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)). The Court disagrees. Where, as here, a plaintiff's requested relief would "maintain the situation that would prevail if the contract were properly performed," it is properly regarded as "prohibitory" and the usual preliminary injunction standard applies. *Bionpharma Inc. v. CoreRx, Inc.*, 582 F. Supp. 3d 167, 174 (S.D.N.Y. 2022) (cleaned up).

As for what Bartch must show a likelihood of success on, the parties agree that the Warrant SPA is governed by New York law and the Series D Transaction Documents are governed by Delaware law. *See* Warrant SPA § 5.9; Series D SPA § 5.9; Pl.'s Mem. 12; Def.'s Opp'n 18, 20. As relevant here, the elements of a breach-of-contract claim — which include the existence of an enforceable agreement, breach of an obligation, and resultant damages — do not differ materially in these states. *See Bionpharma*, 582 F. Supp. 3d at 176; *see also Riccio v. Genworth Fin.*, 124 N.Y.S.3d 370, 372 (2d Dep't 2020); *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).[4]

---

[4] New York law requires a plaintiff to prove its own performance as an element of a breach-of-contract claim. *See, e.g.*, *Riccio v. Genworth Fin.*, 124 N.Y.S.3d 370, 372 (2d Dep't 2020) (identifying as elements "the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach" (cleaned up)). By contrast, Delaware courts consider whether a

Notably, the parties also agree that DBGI failed to perform under the relevant agreements. *See* Answer ¶ 149, at 26 (admitting that DBGI has not approved Bartch's notices to exercise the pre-funded warrants and that it has provided "a range of justifications" for failing to do so); *id.* ¶ 98, at 19 (admitting that DBGI refused to approve the Series D conversion notices submitted by Bartch). Instead, it seeks to rebut Bartch's arguments about likelihood of success on the merits by asserting (1) that neither contract is enforceable because Bartch fraudulently induced DBGI to enter into each, *see* Def.'s Opp'n 18-20; and (2) that, in the alternative, (a) Bartch's multiple prior material breaches of the Warrant SPA excuse DBGI's non-performance, and (b) the express terms of the Certificate of Designation rendered Bartch's Series D conversions null and void, *see id.* at 20-25. The Court will address each argument in turn.

**1. Fraudulent Inducement**

The gravamen of DBGI's fraudulent-inducement argument is that the contracts are unenforceable because Bartch knowingly misrepresented or concealed his coordination with a group of investors and the participation of Scott Gelbard, a non-party investor previously charged with securities fraud, in a common ownership scheme. *See id.* at 4-8, 18-19. Although it is not clear whether DBGI relies on a theory of affirmative misrepresentation or fraudulent concealment, it is no matter, because DBGI's argument fails either way.

---

plaintiff has substantially performed its own obligations in connection with the defense of prior material breach. *See, e.g.*, *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003) (identifying as elements, "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff"); *see also, e.g.*, *BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 281-82 (Del. Ch. 2003) (analyzing whether one party was "justified in refusing to satisfy its . . . obligation" based on the other party's "material breach"). Neither side here suggests that this analytical difference has any bearing on the parties' dispute.

To start, DBGI fails to identify a false or misleading statement, or a material omission, that Bartch made *prior to* the signing of the Warrant SPA or Series D Transaction Documents, as both New York and Delaware law require to make out a claim for fraudulent inducement. *See CMB Exp. Infrastructure Inv. Grp. 48, LP v. Motcomb Ests., Ltd.*, 203 N.Y.S.3d 552, 514 (1st Dep't 2024) (dismissing a fraudulent inducement claim where the plaintiff "did not allege any specific facts with respect to the time, place, or manner of this purported misrepresentation"); *Unisuper Ltd. v. News Corp.*, No. 1699-N, 2005 WL 3529317, at *4, 9 (Del. Ch. Dec. 20, 2005) (similar). Moreover, DBGI's briefing and declarations are devoid of the minimum factual details necessary to support its allegations that Bartch engaged in a group scheme or that Gelbard was involved. *See Lebanon Cnty. Emps.' Ret. Fund v. Collis*, 287 A.3d 1160, 1215 (Del. Ch. 2022) (concluding that a party relying on "fraudulent concealment" must still "plead the circumstances supporting the doctrine with particularity"); *Gorman v. Gorman*, 451 N.Y.S.2d 455, 456 (3d Dep't 1982) ("Bare allegations of fraud, which merely list the material elements of fraud without any supporting detail, are insufficient to satisfy the pleading requirements.").

Moreover, DBGI has not so much as alleged that Bartch's collusive conduct *preceded* contract formation. *See Gomez-Jimenez v. N.Y. L. Sch.*, 956 N.Y.S.2d 54, 59 (1st Dep't 2012) (setting forth the elements of a fraudulent inducement claim under New York law, including "a duty to disclose material information" (internal quotation marks omitted)); *Blue Beach Bungalows DE, LLC v. State*, 351 A.3d 1007, 1043 (Del. 2025) (similar, as to Delaware law). Indeed, DBGI's own timeline does not support a claim of fraudulent inducement. *See* Def.'s Opp'n 2 (alleging only that Bartch "orchestrated and immediately implemented" a scheme "mere days *after* signing" (emphasis added)). Insofar as DBGI argues that Bartch entered the contracts with the intent of breaking them — *i.e.,* by engaging in collusive group activity — that theory

sounds in breach of contract, not in fraud. *See Zutrau v. Jansing*, No. 7457 (VCP), 2014 WL 3772859, at *15 (Del. Ch. July 31, 2014) ("[A] party who has asserted a breach of contract claim may not 'bootstrap' that claim into a claim of fraud, merely by asserting that the promises underlying the contract were made fraudulently."), *aff'd*, 123 A.3d 938 (Del. 2015); *Heffez v. L & G Gen. Const., Inc.*, 867 N.Y.S.2d 198, 199 (2d Dep't 2008) ("[A] cause of action premised upon fraud cannot lie where it is based on the same allegations as the breach of contract claim.").

Finally, even assuming DBGI identified concrete misrepresentations or omissions prior to contract formation, it has not explained, much less demonstrated, why reliance on Bartch's representations was justified. *See Gomez-Jimenez*, 956 N.Y.S.2d at 59 (noting that, under New York law, fraud requires "justifiable reliance of the other party on the misrepresentation or material omission" (internal quotation marks omitted)); *Blue Beach Bungalows,* 351 A.3d at 1043 (similar, as to Delaware law). By DBGI's own admissions, the so-called misrepresentations were either known or readily knowable: DBGI representatives were included on the email chains that copied Gelbard, *see* Def.'s Opp'n 5; ECF Nos. 25-8, 25-23, and Bartch's affiliation with another owner of DBGI securities, Blackstone Mercantile Group Ltd. ("Blackstone"), was public information, *see* ECF No. 25-2; *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir. 1984) (noting that "[w]here sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance"); *Golden Rule Fin. Corp. v. S'holder Representative Servs. LLC*, No. CV 2020-0378 (PAF), 2021 WL 305741, at *15 (Del. Ch. Jan. 29, 2021), *aff'd*, 267 A.3d 382 (Del. 2021) (similar, as to Delaware courts). Accordingly, DBGI's allegations relating to fraudulent inducement do not undercut Bartch's likelihood of success on the merits.

### 2. Prior Material Breaches

Next, DBGI argues that Bartch committed prior material breaches of the agreements, excusing DBGI from any obligation to perform. First, it asserts that Bartch breached Section 3.2(b) of the Warrant SPA by violating multiple federal securities laws and engaging in illegal group activity. *See* Def.'s Opp'n 20-23. Second, it contends that Bartch's breach of the Certificate of Designation invalidated the requested conversions under the Series D Transaction Documents. *See id.* at 24. These arguments do not withstand scrutiny.

First, there is no merit to DBGI's argument that Bartch violated Section 3.2(b) of the Warrant SPA. That subsection provides as follows:

> Such Purchaser is acquiring the Securities as principal for its own account and has no direct or indirect arrangement or understandings with any other persons to distribute or regarding the distribution of such Securities (this representation and warranty not limiting such Purchaser's right to sell the Securities pursuant to the Registration Statement and Final Prospectus or otherwise in compliance with applicable federal and state securities laws). Such Purchaser is acquiring the Securities hereunder in the ordinary course of its business.

Warrant SPA § 3.2(b). Contrary to DBGI's arguments, nothing therein constitutes a general promise to comply with federal securities laws. *See* ECF No. 27 ("Pl.'s Reply"), at 4; *see also, e.g.*, *Tennenbaum Living Tr. v. GCDI S.A.*, 182 F.4th 245, 249 (2d Cir. 2026) ("Under New York law, [a contract] must be interpreted to give effect to the parties' expressed intentions based on the plain meaning of the agreement's terms.").[5]

---

[5] In any event, DBGI bases its prior material breach arguments primarily on Bartch's purported violation of Section 13(d) of the Exchange Act, *see* Def.'s Opp'n 20-21, which is nothing more than a *disclosure* rule mandating that shareholders report beneficial ownership exceeding five percent of a class stock, *see Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58-64 (1975) ("By requiring disclosure of information to the target corporation as well as the Securities and Exchange Commission, Congress intended to do no more than give incumbent management an opportunity to express and explain its position."); *see also Raybestos-Manhattan, Inc. v. Hi-Shear Indus., Inc.*, 503 F. Supp. 1122, 1133 (E.D.N.Y. 1980) (acknowledging "the limitations placed upon injunctive remedies under Section 13(d)"). In other words, allegations that Bartch, or others, violated Section 13(d), even if true, do not, on their own, support a claim of market

Nor does Section 3.2(b) foreclose a purchaser's right to resell, which is the only specific conduct DBGI attributes to Bartch. *See* Def.'s Opp'n 8; *see also* Pl.'s Reply 4; *Glob. Intellicom, Inc. v. Thomson Kernaghan & Co.*, No. 99-CV-342 (DLC), 1999 WL 544708, at *10 n.5 (S.D.N.Y. July 27, 1999) (concluding, with respect to a contract governed by New York law, that a similar "investment representation contain[ed] no restriction that would implicate" alleged short-selling). In fact, elsewhere in the Warrant SPA, the parties explicitly acknowledge that the agreement does not bar a purchaser from reselling securities. *See* Warrant SPA § 3.1(ff) (agreeing that no "Purchaser agreed[] to desist from purchasing or selling, long and/or short, securities of the Company" although such transactions "may negatively impact the market price of the Company's publicly-traded securities"); *see also id.* (agreeing that "each Purchaser shall not be deemed to have any affiliation with or control over any arm's length counter-party in any 'derivative' transaction"). For these reasons, DBGI's allegations of securities violations and nominal resales, *see* Def.'s Opp'n 7-10, even if true, would not breach the Warrant SPA.

Meanwhile, the Court need not and does not reach the question of whether a group market manipulation scheme would violate Section 3.2(b) because DBGI does not offer any evidence to substantiate its conclusory allegations that Bartch orchestrated or even participated in such a scheme. By way of support, DBGI points out that its stock price has risen and fallen rapidly, *see* Def.'s Opp'n 16; ECF No. 24 ("Davis Decl."), ¶¶ 4-12; that these trends occurred alongside a

---

manipulation or securities fraud. *See, e.g.*, *Nano Dimension Ltd. v. Murchinson Ltd.*, 681 F. Supp. 3d 168, 180 (S.D.N.Y. 2023), *aff'd*, 102 F.4th 136 (2d Cir. 2024). And to the extent DBGI *also* alleges violations of Rules 9b and 10b-5 of the Exchange Act, it does not explain how these violations give rise to a breach-of-contract claim. The Court thus rejects DBGI's use of conclusory allegations of deceptive conduct to "transform [a] state law breach of contract . . . action into a fraud claim under the federal securities laws." *Cottam v. Glob. Emerging Cap. Grp., LLC*, No. 16-CV-4584 (LGS), 2020 WL 1528526, at *15 (S.D.N.Y. Mar. 30, 2020) (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 776 (2d Cir. 1991)).

substantial volume of trading, *see* Defs.' Opp'n 16; that Bartch founded Blackstone, *see id.* at 2-3; that Bartch sent emails seemingly referencing an affiliation with Blackstone, *see id.* at 3-4; Dkt. No. 26-CV-6889 (JMF), ECF No. 31-14; that Bartch's online biographies no longer reference founding Blackstone, *see* Def.'s Opp'n 4; ECF No. 25-3-6; that Gelbard was copied in email chains with DBGI and other investors, *see* ECF No. 25-8, 25-23; and that Bartch and other companies sold securities for below market-value, *see* Def.'s Opp'n 8; Dkt No. 26-CV-6889, ECF Nos. 31-6, 31-7. But it does not offer *any* evidence, direct or circumstantial, that Bartch controlled any of the companies with which he purportedly colluded; that Bartch's beneficial ownership ever exceeded 4.99% (in violation of the Certificate of Designation and approaching a violation of the disclosure threshold set forth in Section 13(d) of the Exchange Act), *see supra* n.4; or that Bartch ever intended to mislead DBGI or others while trading DBGI securities, *see, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100-101 (2d Cir. 2007) (requiring a showing of scienter for market manipulation claims). Indeed, DBGI neither identifies the specific "manipulative acts [Bartch] performed" nor the "effect the scheme had on the market." *Id.* at 102 (internal quotation marks omitted). In short, DBGI's allegations of a group market manipulation scheme are mere "speculative inferences" and do not undermine Bartch's breach-of-contract claims. *Id.* at 103.

Nor is there any merit to DBGI's arguments with respect to the Series D Transaction Documents.[6] To excuse its non-performance there, DBGI argues that Bartch violated the plain terms of the Certificate of Designation, which render a conversion "null and void" if it results in

[6] Although Davis initially raised questions about the validity of the assignments to Bartch of the Series D shares, *see* ECF No. 7-15, at 17, DBGI does not dispute their validity here. As a result, DBGI has forfeited any argument that the contractual assignments are unenforceable or otherwise defective for purposes of this motion. *See, e.g.*, *Newman v. ASA Coll., Inc.*, No. 23-CV-3503 (KPF), 2026 WL 1133663, at *5 n.4 (S.D.N.Y. Apr. 27, 2026).

a Series D shareholder "beneficially own[ing] in excess of 4.99% . . . of the Shares of Common Stock outstanding." Certificate of Designation § 5(d). According to DBGI, Bartch's conversion requests — when considered in conjunction with the securities owned by other members of the common scheme — exceed the 4.99% threshold. *See* Def.'s Opp'n 1-3, 24-25. As discussed, however, DBGI's allegations of market manipulation lack basic factual support. So too does DBGI's assertion that any conversion would have put Bartch over the 4.99% threshold. (Bartch, for his part, disavows any "ownership interest or authority in any of the entities" that DBGI identifies as alleged colluders. ECF No. 28 ("Bartch Reply Decl.") ¶¶ 13, 24-26.)

But separate and apart from these flaws, DBGI ignores Section 4.1(e) of the Series D SPA. Under that provision, breach of contract is not a basis for DBGI to withhold approval of any conversion absent a court-ordered injunction obtained on notice, together with a posted bond. *See* Series D SPA § 4.1(e). As the Court explained in rejecting a version of the same argument in opposition to the preliminary injunction motion filed by the *Gaucher* plaintiffs:

> The [Series D] SPA unambiguously provides that, unless DBGI obtains an injunction on notice and with the appropriate bond, DBGI 'may not refuse' conversion 'based on any claim' of noncompliance with the agreement (one of the transaction documents) or 'for any other reason.' . . . In other words, even accepting defendant's allegations [of market manipulation] as true, it has limited its right to refuse conversion with allegations of breach, fraud, or misrepresentation.

Dkt. No. 26-CV-6889 (JMF), ECF No. 71 ("*Gaucher* PI Oral Ruling"), at 34-35; *see also id.* ECF No. 30, at 16-21. As in *Gaucher*, DBGI's argument that material breach of the Series D Transaction Documents excuses non-performance does not survive scrutiny.

**3. Conclusion**

In sum, DBGI's theories for evading its obligations under the Warrant SPA and Series D Transaction Documents do not hold water. The fraudulent inducement and market manipulation claims are unsupported by particularized factual allegations. And while DBGI seeks an

evidentiary hearing, the Court concludes that any such hearing would both amount to a "fishing expedition" and be unnecessary. *See, e.g.*, *United States v. Persico*, No. 85-CR-139-10 (KTD), 2016 WL 9022509, at *9 (S.D.N.Y. June 24, 2016), *aff'd*, 688 F. App'x 58 (2d Cir. 2017). Even were the Court to credit DBGI's speculative allegations, its efforts to undermine the contracts would still fail. First, DBGI has never alleged, not to mention shown, that it relied on any concrete misrepresentations or material omissions, let alone that any such reliance was reasonable. Second, the prior material breach theories rely on misreadings of the contracts' plain language. Accordingly, the Court concludes that Bartch is likely to succeed on the breach-of-contract claims underlying his motion for a preliminary injunction.

**B. The Remaining Preliminary Injunction Factors**

As for the remaining preliminary injunction factors, the Court sees no reason to depart from its prior preliminary injunction decision in *Gaucher*. *See Gaucher* PI Oral Ruling 32-40. There, the Court concluded that there is "concrete evidence confirming the volatility of [DBGI]'s stock" and a "risk that DBGI 'will not be able to pay damages at the conclusion of the litigation.'" *Id.* at 37 (quoting *Castle Creek Tech. Partners, LLC v. CellPoint Inc.*, No. 02-CV-6662 (GEL), 2002 WL 31958696, at *3 (S.D.N.Y. Dec. 9, 2002)). Nothing in DBGI's briefing suggests the company's financial situation has improved since that time. *See* Def.'s Opp'n 28; ECF No. 31, at 7 (DBGI acknowledging that its common stock has declined by "about 87%" between August 5, 2026, and October 19, 2026, placing it at "imminent risk of delisting from The Nasdaq Stock Market"). In fact, DBGI now warns that an injunction "risks driving [it] into insolvency" and that it "faces a likely and imminent risk of bankruptcy." *Id.* (internal quotation marks omitted). And just last month, DBGI reported that it had been accused of defaulting on a $1 million payment due October 23, 2026. *See* ECF No. 28-9; *see also* No. 26-CV-6889, ECF

No. 38-32, at 9 (SEC 10-Q filing confirming that DBGI "has not generated profits since inception and has sustained net losses of $8,983,422" for the three months preceding June 30, 2026 and that "the Company has lacked sufficient liquidity to satisfy obligations as they come due"); *id.* at 47 (representing that DBGI's "existing cash resources and planned operations . . . may not be sufficient to fund operations for at least twelve months"). It is well established that "[i]rreparable harm is found where there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *See Alpha Cap. Aktiengesellschaft v. Advanced Viral Rsch. Corp.*, No. 02-CV-10237 (GBD), 2003 WL 328302, at *5 (S.D.N.Y. Feb. 11, 2003) (cleaned up) (finding irreparable harm where the parties had stipulated that "remedies at law are inadequate and that specific performance is appropriate" and where the plaintiffs' eventual recovery was in jeopardy). Accordingly, Bartch has shown he "is likely to suffer irreparable harm in the absence of preliminary relief." *Citigroup Glob. Mkts.*, 598 F.3d at 34 (internal quotation marks omitted).

The balance of the equities likewise favors Bartch. First, harm stemming from DBGI's failure to seek court intervention prior to withholding the Series D SPA conversions was "self-inflicted." *Convergen Energy WI, LLC v. L'Anse Warden Elec. Co., LLC*, No. 20-CV-5240 (LJL), 2020 WL 5894079, at *5 (S.D.N.Y. Oct. 5, 2020) (internal quotation marks omitted). Moreover, the harm that DBGI might sustain from the non-fulfillment of the Warrant SPA is harm that it "was — or should have been — aware" of when it agreed to the contract's terms. *See Bionpharma Inc.*, 582 F. Supp. 3d at 179. On the other hand, Bartch faces the real and financially detrimental possibility that DBGI will not make good on its promises. *See* Pl.'s Reply 10. Finally, the Court concludes that a preliminary injunction serves the "the strong public policy of enforcing valid contracts" — particularly in this case, involving two well-

resourced and sophisticated contracting parties. *Avon Co. v. Fareva Morton Grove, Inc.*, No. 22-CV-4724 (AKH), 2022 WL 2208156, at *9 (S.D.N.Y. June 21, 2022); *see Citigroup Glob. Mkts.*, 598 F.3d at 34.

**CONCLUSION**

For the foregoing reasons, Bartch's motion for a preliminary injunction is GRANTED. Pursuant to the Court's "wide discretion in the matter of security," it concludes — as it did with respect to the *Gaucher* plaintiffs — that Bartch should not be required to post a bond. *See Dr.'s Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (internal quotation marks omitted). After all, DBGI does not request a bond, and it has not identified any loss independent of the obligations it agreed to sustain when it entered its agreements with Bartch. *See, e.g.*, *IME Watchdog, Inc. v. Gelardi*, 732 F. Supp. 3d 224, 243 (E.D.N.Y. 2024) (holding that a bond is not necessary where the "[p]laintiff is highly likely to prevail on the merits in this litigation and . . . the hardship to [d]efendants from a preliminary injunction, if any, would therefore be minimal").

Bartch shall draft a proposed preliminary injunction order consistent with this ruling, and, within **two business days of this Opinion and Order**, the parties shall confer and submit an agreed-upon order or competing orders (with a redline showing the differences and supporting letters, not to exceed three pages each).

The Clerk of Court is directed to terminate ECF No. 5.

SO ORDERED.

Dated: November 24, 2026
New York, New York

JESSE M. FURMAN
United States District Judge